## Case No. 12,957.

SLOO et al. v. LAW et al.

[3 Blatchf. 459.] [1]

Circuit Court, S. D. New York. May 16, 1856.

CONTRACTS—ACT OF CONGRESS—TRUSTEES—RIGHT OF A PART TO ACT—PUBLIC AND PRIVATE TRUSTS — DEALING WITH TRUST PROPERTY — INJUNCTION.

1. The act of March 3, 1847 (9 Stat. 187), to provide steamships for carrying the mails to California by the way of Chagres, expounded.

2. The various contracts entered into under that act, explained.

3. Where a strict trust is created, and two or more trustees are appointed to execute it, if it is a private trust, in which the public have no interest, and if it does not appear from the instrument creating it, or from some other instrument modifying the power given, or by fair and necessary implication, that it may be executed by a less number of the trustees than the whole number named, the powers conferred must be executed by all of them.

[Cited in brief in Morville v. Fowle, 144 Mass. 113, 10 N. E. 766.]

4. If a trust is created, and two or more trustees are appointed to execute it, and it is a public trust—a trust for the benefit of the public, in which the public are interested—and if it does not appear from the instrument creating it, that it must be executed by the whole number of trustees named, it may be executed by a majority of them.

5. When a private trust is created, and it appears from the instrument creating it, that the powers conferred are to be executed by a less number than the whole of the trustees named, they can be lawfully executed by such less number.

---

1 [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

6. If a public trust is created, and it appears from the authority creating it, that the powers conferred are not to be executed except by the joint act of all the persons named as trustees, they must be executed by all of the trustees unitedly.

7. In both classes of trusts, the intention of the authority creating the trust must govern, but the presumption of law as to what such intention is, differs in the two classes of trusts.

8. These principles applied to the trust created by the various contracts entered into under said act.

9. A private mercantile enterprise, conducted for profit, having been entered into by said contracts, and the management of the affairs thereof having been confided to three trustees, the presumption is that the intention of the parties was that a majority of the trustees might conduct the business.

10. And such presumption is strengthened by various provisions in the contracts.

11. A trustee will not be permitted to take advantage of his situation, to obtain any personal benefit to himself at the expense of his cestui que trust.

[Cited in Petrie v. Badenoch (Mich.) 60 N. W. 450.]

12. Where two of such three trustees, without the assent of the third trustee, made a contract between themselves as trustees, and themselves and other individuals, from which they derived a great profit, to the prejudice of one of their cestuis que trust, an injunction was granted, restraining them from doing any act of the kind for the future, without the assent of the three trustees, the third trustee being the representative of such cestui que trust.

13. One of the trustees having refused to permit another of the trustees to have access to the books and papers of the trustees, an injunction was granted, restraining him from withholding such books and papers from the examination of such trustee.

[Bill in equity by Albert G. Sloo and Elwood Fisher against George Law and others.] This was a motion for a provisional injunction.

Edward N. Dickerson and Elwood Fisher, for plaintiffs.

Benjamin F. Butler and Francis B. Cutting, for defendants.

INGERSOLL, District Judge. By an act of congress, passed on the 3d of March, 1847 (9 Stat. 187), it was made the duty of the secretary of the navy, to contract, on the part of the government, with A. G. Sloo, one of the plaintiffs, for the transportation of the United States mail from New York to New Orleans and back, twice a month, touching at Charleston, (if practicable), Savannah, and Havana, and from Havana to Chagres and back, twice a month; and it was provided, that said mail should be transported in at least five steamships of not less than fifteen hundred tons burthen, to be propelled by engines of not less than one thousand horse power each, and to be constructed under the superintendence and direction of a naval contractor in the employ of the navy department, and to be so constructed as to render them convertible, at the least possible expense, into war steamers of the first class; that the said steamships should be commanded by officers of the navy not below the grade of lieutenant, who should be selected by the contractor, with the approval and consent of the secretary of the navy, and who should be suitably accommodated without charge to the government: that each of said steamers should receive on board four passed midshipmen of the United States navy, who should serve as watch-officers, and be also suitably accommodated without charge to the government; and that each of said steamers should also receive on board and accommodate, without charge to the government, one agent to be appointed by the postmaster general, who should have charge of the mails to be transported in said steamers. It was also provided, that the secretary of the navy might, at his discretion, permit a steamer of not less than six hundred tons burthen and engines in proportion, to be employed in the mail service between Havana and Chagres. The compensation for the whole of said services was not to exceed the sum of two hundred and ninety thousand dollars; and good and sufficient security was required to be given for the fulfilment of the stipulations of the contract to be entered into by Sloo. It was also made the duty of the secretary of the navy to provide, in the contract authorized by the act to be made, that the navy department should at all times exercise control over the steamships, and have the right to take them at any time for the exclusive use and service of the United States, and to direct such changes in their machinery and internal arrangements as the secretary of the navy might require, and to make in the contract due provision for the mode of ascertaining the proper compensation to the contractor therefor.

In passing this act, congress appears to have had two great objects in view. One was to secure the transportation of the public mails; the other was to secure the construction of five steamships, which could at any time, at the least possible expense, be converted into war steamers of the first class, to be taken, in case of need, at any time, at the option of the United States, for their exclusive use and service, upon their paying a proper compensation for the same.

Before Sloo could secure to himself the benefit of any portion of the money authorized to be paid by this act, he had heavy responsibilities to enter into, and important duties to perform. He was, among other things, obliged to contract with the government, for building the five steamships mentioned in the act, for the performance of the mail service required; to contract, also, to perform the mail service as required by the provisions of the act; and to give good and sufficient security for the faithful performance of the stipulations of the agreement so to be entered into by him. To do this, required aid from some source. The act itself required that he should have aid from some one; for it

provided that good and sufficient security should be given for the fulfilment of the stipulations which, by the act, he was obliged to enter into. It could, therefore, in no respect, be any disparagement to him, to apply for aid to those who might be able to render it, and who could be induced to render it by a participation in the benefits promised to Sloo by the act, upon his compliance with the terms upon which such benefits were to be realized.

On the 20th of April, 1847, Sloo and the secretary of the navy entered into a contract, by which Sloo agreed to build the five ships according to the provisions of the act, and to perform the mail service therein required, two of the ships to be of the burthen of fifteen hundred tons, and to be completed and ready for service on or before the 1st of October, 1848, and two of them, of the like description, to be completed and ready for service on or before the 1st of October, 1849; and Sloo agreed, by the contract, that the line of steamships should be kept up during the time the contract was to continue, by alterations, repairs, or additions (of approved character) fully equal to the exigencies of the service, and the faithful accomplishment of the purposes recited in the act, and that he would perform the services required by the act according to its true intent and meaning, and that the line should be in full and entire operation on or before the 1st of October, 1849. The secretary of the navy agreed, on behalf of the United States, to pay to Sloo, for the services stipulated to be performed, the sum of two hundred and ninety thousand dollars per annum, payable in quarterly payments, upon the full performance by Sloo of the services required, according to the meaning of the act. The contract was to continue in full force for the term of ten years, to commence from the actual commencement of the services specified; and the secretary reserved the right to take the ships at any time for the exclusive use and service of the United States, the proper compensation for their value, when so taken, to be ascertained by appraisers to be mutually chosen by the parties. There were other stipulations in the contract, which it is not necessary to mention.

It will thus be seen, that Sloo, among other things, not only agreed to build the five steamships according to the requirements of the act, but also agreed that, during the time the contract had to run, the line should be kept up by alterations, repairs, or additions of approved character, so that the purposes of the act could be faithfully accomplished. One of those purposes was to provide five steamships which could, at any time during the continuance of the contract, be taken by the government, upon their paying a proper compensation for the same, and, with the least possible expense, be converted into war steamers of the first class, to become part of the naval armament of the United States. To effect this purpose, it was necessary, not only that the five steam-

ships should be properly built, but that they should at all times be kept in proper repair, and fit for the service to which they were or might be appropriated. The contract was executed without security for the faithful performance of the stipulations on the part of Sloo. But at a subsequent period Robert C. Wetmore, Marshall O. Roberts, George Law, and Edwin Croswell became sureties for the fulfilment of the terms thereof.

Sometime between the date of the execution of the above mentioned contract with the secretary of the navy, and the 17th of August, 1847, as appears by an indenture executed on the last mentioned day, Sloo applied to George Law, Marshall O. Roberts, Edwin Croswell, and Prosper M. Wetmore, for aid to enable him to fulfil the terms and conditions of the contract entered into by him with the secretary of the navy. Law and his associates, the persons above named, agreed to aid him, as expressed in the indenture on that day entered into, upon his executing an assignment of the said contract to certain parties, upon the trusts and for the uses and purposes in the said indenture of the last mentioned date named. Accordingly, on the 17th of August, 1847, an indenture was entered into by and between Sloo of the first part, Law, Roberts, Croswell and Wetmore, of the second part, and Law and Roberts and Bowes R. McIlvaine, of the third part, by which Sloo assigned to the parties of the third part the contract which he had entered into with the secretary of the navy, upon the trusts in the said indenture mentioned. By this indenture, Law and his associates of the second part agreed with Sloo, that they would build, construct, finish and completely equip the steamships which, by the contract with the secretary of the navy, were to be built by Sloo, according to the terms of the said contract, and that they would perform all the duties and services which, by the contract with the secretary of the navy, were to be performed by Sloo; and it was provided that the ships and their machinery should be built, constructed, equipped, and repaired under the superintendence, direction and control of Law.

The assignment of the contract made with the secretary of the navy was upon certain trusts, among which were the following: that the trustees should cause the ships which were to be built to be registered in their names; that they should have the sole management and direction of the same and of their employment, subject to the provisions of the contract, and should pay all officers and agents; that they should make all necessary contracts for the employment of the ships; and that they should receive and collect all the freights and earnings of the ships, and all the mail pay, and render to the parties quarter-yearly an account of all receipts and expenditures. They were to apply the nett earnings, at the expiration of each quarter, in the first place to the payment of the sum of twelve thousand five hundred dollars quarterly, one half to Sloo,

and the other half to Law and his associates of the second part, and the residue to the repayment of all advances made for the building, equipping, and finishing the ships, together with lawful interest, and a commission of ten per cent.; and, when all such advances were paid, with the interest and commissions, then the nett earnings of the ships and the mail pay were, at the end of each quarter, to be divided equally, one half to be paid to Sloo, and the other half to Law and his associates of the second part; and the ships were to be held by the trustees in trust for the party of the first part and the parties of the second part, in equal shares. At the expiration of the contract with the secretary of the navy, the trustees were to sell the ships, and divide the nett proceeds, and pay one half thereof to the party of the first part, and the other half to the parties of the second part.

By the indenture, Roberts and Croswell were appointed joint agents in the city of New York, for the transaction of the business of the ships, under the direction and control of the trustees. Roberts was to receive, as a compensation for acting as such agent, the sum of ten thousand dollars per annum, and Croswell was to receive, as a compensation for acting as such agent, the sum of five thousand dollars per annum, such payments to be made out of the joint funds. Law was to receive, as a compensation for his services in constructing, repairing and equipping the ships and their machinery, five thousand dollars per annum, also to be paid out of the joint funds. The compensation of McIlvaine was to be paid out of the profits of Sloo. In the event of the death of either Law or Roberts, or of their resignation of the office of trustee, it was made the duty of the parties of the second part to fill the vacancy. In the event of the death of McIlvaine or of his resignation, Sloo had the power to appoint another trustee in his place. It was not his duty so to do. Law and his associates of the second part had the right to associate any other persons or parties in interest with them, who should, by being so associated, be entitled to all the benefits of the contract and of the trust created, in like manner as if they had been originally named as parties. The trustees were not to be liable for the acts, defaults, or misconduct of each other, but each only for his own acts, defaults and misconduct.

On the 7th of February, 1850, another indenture was entered into, by and between Sloo, of the first part, and Law, Roberts, Croswell and Wetmore, of the second part, which in some respects modified the terms of the above mentioned indenture. Differences had arisen between the parties, growing out of the obligations entered into by the indenture of the 17th of August, 1847. The contract with the secretary of the navy was, that the whole of the five steamships should be finished and ready for service by the 1st of October, 1849. Law and his associates had become obligated to Sloo to perform that contract. Two of the

ships contracted to be built by that time had not been commenced, and none of the ships which had been finished had as yet been placed in the hands and under the control of the trustees. To settle the matters of difference, this indenture of the 7th of February, 1850, was entered into. By this indenture, Law and his associates agreed to deliver and place three of the ships, to wit, the Ohio, Georgia, and Falcon, in the immediate possession, management, and control of the trustees, and cause the same to be registered in their names. By the indenture first entered into, Law and his associates were to make advances for the building of the five steamships, and have them completed by the 1st of October, 1849. By the indenture of the 7th of February, 1850, they were absolved from the obligation to make advances for the building of the two remaining steamships, in the way provided for in the indenture of the 17th of August, 1847, and, in substitution for that obligation, they agreed to commence the building of the remaining two steamships as soon as the sum paid to them by the trustees, in reimbursement of the cost of the first three ships, should amount to fifty thousand dollars. There are other provisions in the indenture of the 7th of February, 1850, which, so far as it respects the motion now under consideration, it is not necessary at present to notice.

The United States Mail Steamship Company was incorporated by the legislature of the state of New York in April, 1850. Law, Roberts, Croswell and Wetmore, were the original corporators of that company. On the 8th of July, 1850, an indenture was entered into by and between Law, Roberts, Croswell and Wetmore, of the first part, and the United States Mail Steamship Company, of the second part, by which Law and his associates assigned and transferred to the steamship company their interest in the three ships already built and placed in the hands of the trustees, and in the said agreement between Sloo and the secretary of the navy, and in the said indentures of the 17th of August, 1847, and the 7th of February, 1850, and in all the benefits of the last mentioned two indentures, and all their rights and powers under the same, reserving to Law, Roberts and Croswell their respective salaries, provided for and agreed to be paid according to the last mentioned two indentures, the same as if the indenture then executed had not been entered into, and reserving to them their rights and privileges—that is to say, to Law, the right to superintend the construction, building and repairing, under his own sole control, of all the ships which had been or might be built, and the right to Roberts and Croswell to be agents of such ships in the city of New-York, and to receive their respective salaries therefor. It was also agreed, by said indenture, that the trustees should account to the company, instead of accounting to Law and his associates, the company succeeding to all their rights, ex-

cept so far as the same were reserved: and the company agreed to build, construct, finish and completely equip all the steamships which, by the contract with the secretary of the navy, were to be built, in such manner and at such times as were or might be required by the navy department of the United States: and the company agreed, that they would in all things perform all the duties and services which, in the contract with the secretary of the navy, were to be performed by Sloo, and perform all the stipulations contained in the indentures of the 17th of August, 1847, and the 7th of February, 1850, and which were, by said indentures, to be performed and fulfilled by Law and his associates; and the company agreed to indemnify Law and his associates for being sureties for Sloo for the faithful performance of his contract with the secretary of the navy. At the time the indenture of the 8th of July, 1850, was entered into, Law was president of the steamship company, and Roberts and Croswell were two of the directors.

On the 21st of January, 1851, there was another indenture entered into by Sloo, of one part; Law, Roberts, Croswell and Wetmore, of another part: the United States Mail Steamship Company, of another part: the Pacific Mail Steamship Company, of another part: and Howland & Aspinwall, of another part. By this indenture, an arrangement was made for the purchase of five additional steamships, and for placing them in the hands of the trustees, upon the trusts contained in the indenture of August 17, 1847: thus increasing the trust ships to ten. They were to be paid for by the United States Mail Steamship Company in the stock of that company: and it was agreed that Howland & Aspinwall should sell, under the control and instructions of the United States Mail Steamship Company, all through passage tickets issued by said company, and should receive all passage money for through tickets, and all freight money for through freights of every description, by any of the steamers of the said company or of the trustees, from New York to any port on the Isthmus of Panama, from New Orleans to any port on said isthmus, from any port on said isthmus to New York, and from any port on said isthmus to New Orleans; and it was agreed by them that they would, without delay, deposit all moneys so received, to the credit of the trustees, in such bank as the trustees might from time to time designate, reserving out of such receipts a commission of two and one-half per cent, upon the gross amount of such passage and freight monies. There are a great many other provisions in this last mentioned indenture, which, so far as it respects the motion now under consideration, it is not necessary at this time to notice.

George Law has resigned his office of trustee, and James Van Nostrand has been appointed in his stead. His resignation took place in the spring of 1854. Bowes R. McIlvaine, in the spring of 1855, resigned his office of trustee, and thereupon Elwood Fisher, one of the plaintiffs, was appointed in his stead.

The bill in this case was filed in May, 1855. The parties defendant to it are George Law, Marshall O. Roberts, James Van Nostrand, Edwin Croswell, Prosper M. Wetmore, William H. Aspinwall, John L. Aspinwall, William E. Howland, Samuel W. Comstock, the United States Mail Steamship Company, and the Pacific Mail Steamship Company. In the bill are various charges of fraud and other wrongful acts of omission and commission. The prayer is, among other things, that Law, Roberts, Croswell and Van Nostrand may be decreed to account for the monies by them received, or which they might have received, on account of the trust, and pay the same over to the trustees; that Law and Roberts be decreed to pay over to the trustees certain sums of money charged to have been fraudulently received from the trust; that Howland & Aspinwall render an account of the monies which they have received, and pay what is due from them to the trustees; that they be enjoined from any interference with the affairs of the trust; that they and the Pacific Mail Steamship Company be enjoined from selling tickets and collecting freights, or having any connection with any steamer or line of steamers running in opposition to, or in the line of the trustees, and that they be decreed to pay back to the trustees certain monies, charged in the bill to have been withheld under a partnership charged to have been established with the Nicaragua Company; that the United States Mail Steamship Company be decreed to refund certain monies, charged in the bill to have been received under certain pretexts; that Roberts be removed from the office of trustee, and that some fit person be appointed as trustee in his stead; that Roberts and Croswell be removed from their positions as agents, and that fit persons be appointed in their stead; and that Roberts and Croswell be enjoined from receiving any of the trust funds and from interfering with the trust affairs, and that they deliver up all the books of the agency to the trustees. There is no prayer that Van Nostrand be removed from his office of trustee.

A motion is now made, founded on the bill and the affidavits of Bowes R. McIlvaine and Elwood Fisher, for an injunction restraining Roberts and Van Nostrand from acting as trustees without the concurrence or assent of the three trustees; and enjoining Roberts and Croswell, as agents, or in any other capacity, from the management of the steamships belonging to the trustees, and from the appointment or payment of any officers or other persons concerned in them or their business, and from making any contracts or agreements for the employment of any vessels, and from doing any business or acts of the trustees, under their appointment as agents, or otherwise,

without the consent of the three trustees, and restraining Howland & Aspinwall from retaining any monies collected by them for passages, freights, or otherwise, and from depositing it anywhere, or to any account, except to the account of the three trustees; and restraining the United States Mail Steamship Company from landing any of their steamers at the wharf or pier of the trustees, and from employing them in their business, except under the direction of the three trustees; and restraining Roberts and Croswell and the United States Mail Steamship Company from withholding the books and papers of the trustees from their inspection, or that of either of them, during the usual hours of business.

There are many charges set out in the bill, both of omission and commission, which, upon the final hearing upon the bill and proofs, will require an investigation, and which, if found to be true on such final hearing, will entitle the plaintiffs to relief, which are not material to be considered upon the motion now pressed upon the court. Among these charges is the charge that George Law has fraudulently obtained and appropriated to his own use large sums of money which of right belong to what is called the trust fund. Law is not a party to this motion, although he is a party to the bill. Upon this motion, he is not called upon to answer any of the charges of fraud brought against him. He should, therefore, not be in the least prejudiced by any determination which the court may now make; and any intimation of an opinion upon any of the charges in the bill which are not material to the questions now presented on motion for a preliminary injunction, founded upon the ex parte affidavits which have been presented, however important it may be to have those charges investigated upon the final hearing, would not be conducive to the due administration of justice. I shall, therefore, consider only such questions as seem to me to be necessary to a just and equitable disposition of the motion now made.

The plaintiffs found their claim to have a preliminary injunction issue as prayed for on this motion, upon the ground that, by the indentures of the 17th of August, 1847, the 7th of February, 1850, and the 21st of January, 1851, a trust has been created in the mail contract entered into between Sloo and the secretary of the navy, in certain steamships which have been built and procured by virtue of the provisions of the said indentures, and in the management of the same, which is to be executed by the so-called trustees named in the indenture of the 17th of August, 1847, or by their successors duly appointed; that the trust so created can only be executed lawfully by the joint concurrence of all the trustees named; and that the business relating to the trust, and for which the trust was created, is managed and directed by the two trustees appointed by Law, Roberts, Croswell, and Wetmore (or by the United States Mail Steamship Company, which has succeeded to the rights of Law and his associates), without the concurrence of the trustee appointed by Sloo, and often in opposition to his express wishes and directions. They also claim that, if the trust powers can be executed by a majority of the trustees, without the concurrence of the third, such powers have been so wrongfully executed by the majority, and that there is such danger that they will continue to be so wrongfully executed, that the interposition of the court is required to protect Sloo in his equitable rights.

Where a strict trust is created, and two or more trustees are appointed to execute it, if it is a private trust, in which the public have no interest, and it does not appear from the instrument creating it, or from some other instrument modifying the power given, or by fair and necessary implication, that it may be executed by a less number of the trustees than the whole number named, the powers conferred must be executed by all the trustees named. A less number than the whole cannot lawfully execute the trust powers. And, if a trust is created, and two or more trustees are appointed to execute it, and it is a public trust —a trust for the benefit of the public, in which the public are interested—then, if it does not appear from the instrument creating it, that it must be executed by the whole number of trustees named, and not by a less number, it can be executed by a less number than the whole number named. It may be executed by a majority of the trustees named. This is the general rule. In the application of the rule, there is difficulty sometimes in determining whether the case under consideration is a private trust or a public trust. But, when a private trust is created, and it appears from the power of appointment—from the act and deed of the party or parties creating it—that the powers conferred are to be executed by a less number than the whole of the trustees named, then they can be lawfully executed by such less number. And, if a public trust is created, and it appears from the power of appointment—from the authority creating it— that the powers conferred are not to be executed except by the joint act of all the persons named as trustees, then the trust powers of such public trust cannot be executed but by all the trustees unitedly. In both classes of trusts, the intention of the party or parties, or of the authority creating the trust, is to govern. In the one class of trusts, the presumption of law is, where nothing appears to the contrary, that it was intended, by the parties creating the trust, that the powers conferred should be executed only by the joint act of all the trustees named. That presumption must govern, unless a different intent appears. And,

if such different intent does appear, then such different intent must govern, in the execution of the trust powers. In the other class of trusts, the presumption of law is, where nothing appears to the contrary, that it was intended by the party or the authority which created the trust, that the powers conferred might be executed by a less number than the whole number of the trustees named. And that presumption also must govern unless a different intent appears. And, if such different intent does appear, then such different intent must be carried into effect. The object is to ascertain the intent of the parties, or of the authority creating the trust. That object may be gathered from the language used and the purposes to be accomplished. And, in ascertaining and carrying out the intent of the parties, or of the authority creating the trust, courts are inclined, especially in equity, to vest in the trustees such powers as are necessary to effectuate the wishes of the party or parties creating the trust.

In the present case, the objects to be accomplished by the several indentures by which the trust was created, and which gave the powers and prescribed the duties to the trustees, in the management of the business confided to them, were not only to carry the mails of the United States in compliance with the contract made with the secretary of the navy, and to build five steamships according to the terms of that contract, and to keep the same in repair, so that they could be converted at any time into war steamers of the first class, and be taken and appropriated by the government for that purpose, but also, by means of such five steamships, and five other steamships which were brought into the concern and placed in the hands of the trustees, to engage in and prosecute with success a great commercial business. Without such business, the enterprise which the parties entered into would be a ruinous one. To pursue it with success, (and success was desired by all,) required promptitude, skill and energetic action. One object being to engage in such great commercial business, it is fair to presume, and is a necessary implication, that the parties intended that it should be conducted as other mercantile enterprises of a similar character are conducted, when prosecuted with success under the charge of more than two persons— that is, that in the management of the business of the concern, the judgment and action of the majority should not be overruled and thwarted by one of their associates. The indenture of the 17th of August, 1847, was, in substance an agreement entered into between Sloo, Law, Roberts, Croswell and Wetmore, to engage in and pursue a great commercial and mercantile undertaking, for their mutual advantage and profit. The business to be pursued was pointed out. Each agreed to advance a portion of capital to the common stock or fund. The capital which Sloo agreed to advance was a mail contract. The capital agreed to be advanced by the other parties was five steamships. The motive which led to this arrangement was profits. A mode was pointed out, how the expected profits were to be divided, and how the capital or common stock should be divided when this mercantile business arrangement should expire. And the parties stipulated to place the capital which they agreed to advance for this great commercial business, in the hands of two of their number and of another individual, as managers, directors, or trustees, to manage for them, to pursue the business contemplated by the indenture, to make profits out of the same, and to divide the profits, and in time the capital, as had been agreed by the articles of partnership, or deed of association, or by whatever other name the indenture might be called. The nature of the indenture or agreement cannot be changed by calling it by any particular name. Call it by what name you will, it was an association of individuals for the transaction of a great commercial business, with the view to divide the profits, after paying expenses, in certain proportions, among the different members who had advanced or agreed to advance the needful capital, and for whose common benefit the business was to be conducted. It has been called by the defendants a partnership, and it has been insisted by them that it was such, and was to be governed, in its direction, by the rules which apply to copartnerships, as they are generally conducted. The contract evidenced by the indenture has certainly the chief elements of a partnership. It was a contract between two or more persons to place their money, effects, property and articles of value in a common stock, and, with such common stock, and by its means and aid, to engage in a lawful commercial business, with the agreement to have the profits of such commercial business divided among them in certain proportions. In one respect it was different from an ordinary copartnership. The business contemplated was not to be under the control of the parties in interest as such, but such control was to be directed by the trustees appointed and to be thereafter appointed. It is not necessary to determine whether it was or was not a partnership in the strict technical sense of the term. It was a contract in the nature of a partnership, having in view the objects for which a commercial partnership is formed, and designed to effectuate those objects, and, by means of the trusts created, made indissoluble by the act of any one of the parties during ten years, the period that it was to continue and be in operation. And, in appointing the three managers, directors, or trustees, to manage the business, it is not to be presumed that the parties for whose benefit

this commercial business was to be con-ducted. intended, when other commercial business enterprises carried on by the instrumentality of ships are conducted and directed by the will of the majority, that a different rule should govern in the management of the commercial business in which they were about to engage. And, when we consider that the mail contract, if performed, would yield in ten years the sum of $2,900,000. and that Law, Roberts, Croswell and Wetmore were sureties to the government, in the sum of $500,000, for the faithful performance of that contract, the presumption is strengthened, that they never intended to put it in the power of one of the so-called trustees, who had no pecuniary interest in the business of the enterprise, other than to realize the salary provided for him by the indenture, and who was under no responsibility to the United States, to stop by his veto the sailing of the ships at the times appointed by the other two managers or trustees, and thereby forfeit the benefits secured by the contract, and subject the parties in interest to the heavy responsibility which they had incurred to the government.

Aside from this presumption, certain provisions in the indentures which the parties entered into, show that the united and joint action of the three trustees was not required in the management of the business. In case of the death or resignation of McIlvaine, or in case he should become incapable of acting, there was no necessity of appointing a trustee in his place. Sloo had the power to appoint; but there was no duty imposed on him or any one else to appoint. The trustees were not responsible for the acts, defaults, or misconduct of each other, but each was responsible only for his own acts, defaults, or misconduct. And, in the indenture of the 7th of February, 1850, which was entered into to settle the differences which had arisen, it appears very satisfactorily, by necessary implication, that the business contemplated could be conducted without the joint concurrence of the three trustees. On account of certain differences which existed in the year 1849, a suit was commenced by Sloo against the other parties to the indenture of the 17th of August, 1847. In that suit, Sloo claimed that the business of the concern should not be conducted except with the joint concurrence of all of the trustees. While that suit was pending, the parties came to a settlement of their matters in dispute. The terms of the settlement appear by the indenture of the 7th of February, 1850. By that indenture, the joint concurrence of all of the trustees was expressly required to only one act. That act was, to give a mortgage of the ships. Before the settlement, Sloo had insisted that a united concurrence was required in all cases. The other parties had insisted that no such

united concurrence was required in any case. They settled their matters in dispute, and, in the settlement, a united concurrence of all of the trustees was expressly required in only one case, thereby, by necessary implication, admitting that, in all other cases, no such united concurrence was required.

It appears, then, fairly, from the indentures which the parties entered into, that the business contemplated by the indenture of the 17th of August, 1847, can be rightfully conducted and directed without the united concurrence of the three trustees —that such was the intention of the parties. It is, therefore, unnecessary to consider the question, whether the trust created by that indenture was technically a private trust or a public trust.

The next question is—have the fiduciary powers and duties been so wrongfully executed by the majority of the trustees, or by one acting in behalf of the majority, and is there such danger that they will continue to be so wrongfully executed, that the interposition of the court can be justly required to protect Sloo in his equitable rights?

It is one of the settled principles of courts of equity, that a trustee shall not take advantage of his situation, to obtain any personal benefit to himself at the expense of his cestui que trust. Upon this principle it is, that a trustee is not permitted to purchase the trust estate, or to make a contract with himself individually, or one in which he is personally interested, and from which he may derive a profit, to the prejudice of his cestui que trust. Such transactions are discountenanced by courts of equity, as they afford a great temptation for the violation of fiduciary duties, and often lead to fraud, by which the rights of cestuis que trust are violated. The lord chancellor, in the case of Broughton v. Broughton, 31 Eng. Law & Eq. 587, 590, says: "The rule that a trustee is not to be allowed to make a profit of his trust, is not, in my opinion, stated in a sufficiently stringent manner. The rule is based on a rule of human nature, that no person having a duty to perform shall be allowed to place himself in a situation in which his interest and his duty may conflict. And such is the case where a trustee, though he might employ others to do certain things, and pay them out of the trust fund, does them himself, and takes payment from the trust fund. Therefore, it is an obvious corollary, flowing from the rule, that no person from whom fiduciary duties are expected shall be enabled to make a profit of the trust by employing himself." Law was the first president of the United States Mail Steamship Company. He has been succeeded in that office by Roberts, who is now the president of the corporation. The capital, as sworn to by Roberts, is two millions of dollars, and of that capital he owns an amount of about six hundred thousand dollars. Law took, in the stock of the company, when it

was formed, an amount of over seven hundred thousand dollars. Croswell and Wetmore are also stockholders in the corporation. Sloo is not a stockholder.

It is, among other things, charged in the bill, that Law and Roberts, two of the trustees named in the indenture of the 17th of August, 1847, in conducting the business contemplated by that indenture, and others having agencies therein, have so managed as wrongfully to permit the ships of the trust to remain unemployed, and, from time to time, to substitute in their place ships of the United States Mail Steamship Company, to carry on the business contemplated by that indenture, at enormous rates of pay, in violation of the equitable rights of Sloo, and in violation of the trusts confided to them, by which Sloo has been defrauded and his rights put in jeopardy. It should be borne in mind, in considering this part of the case, that Law was a trustee until the spring of 1854, when he was succeeded by Van Nostrand; and that, during the whole of the time, the building and repairing of the ships belonging to the trust were under his superintendence, direction and control, for which he received five thousand dollars per annum.

In September, 1853, the steamship United States, belonging to the United States Mail Steamship Company, was, by Law and Roberts, without the approbation or authority of either Sloo or McIlvaine, contracted for to perform, in part, the business contemplated by the indenture of the 17th of August, 1847. She was kept in the employ of the trust for the period of twelve months. The price paid for her charter was $10,000 a month, making in the whole $120,000. She was chiefly employed between New Orleans and Aspinwall. At the expiration of the twelve months, she was sold by the United States Mail Steamship Company, for $60,000. At the time she was so employed, there were nine steamships which belonged to what is called the trust, one of the ten having been destroyed by fire a short time previously. The services of five ships, and no more, were required to fulfil the mail contract entered into with the government.

Upon this state of facts, as set forth in the bill, unless they are denied, excused, or justified by the opposing affidavits, there would be a clear breach of trust on the part of Law and Roberts—a clear violation of duty, prejudicial to the rights of Sloo, and of which he would have a right to complain. Upon this state of facts, the steamship United States was brought into the service of the trust, by virtue of a contract between Law and Roberts, in their fiduciary capacity, and the United States Mail Steamship Company, Law or Roberts being president of the same, and in which they had a controlling pecuniary interest as stockholders, by which they were enabled to make a large profit to themselves, under the pretext of performing a fiduciary duty. The transaction, unexplained, was, in substance, a contract between themselves, as trustees, on the one part, and themselves and other individuals, on the other part, from which they derived a great profit, to the prejudice of their cestui que trust, Sloo.

The facts, as above set forth, in relation to the steamship United States, are not denied by the opposing affidavits. Her employment is attempted to be justified by the allegation of facts which are not set forth in the bill. Roberts, in his affidavit, says, that there was a necessity for the employment of the United States; that, at the time she was employed, and for the whole time she continued to be employed, there were not ships enough belonging to the trust in repair, to perform the service required by the mail contract; and that, to save that contract, was one reason why the United States was employed for the period of twelve months. At the time this contract was entered into, as has been before remarked, there were nine steamships which belonged to the trust. I received the impression, upon the first examination given to the affidavit of Roberts, that, at the time the United States was chartered, the steamship George Law, one of the ships of the trust, was not completed. He says that, in the month of August, 1853, she "was not yet fully completed." But, it appears clearly, from the documents which accompany that affidavit, that, when that charter for the United States was effected, the George Law was fully completed; or, it appears that that charter was effected on the 27th of September, 1853, and that the George Law was fully completed before the 15th of September, 1853, on which day she made her first trip in the business of the trust. It required five ships, and five only, to perform the mail service. The inquiry is naturally suggested, why it was, that for the period of twelve months, five of the ships belonging to the trust (a majority of them), were in such a bad state of repair that they could not be employed in the service required, when Law, one of the trustees, had the superintendence of the repairs and the control thereof, and was paid out of the trust fund, for such superintendence and control, the sum of five thousand dollars per annum; and when he and his associates were under an obligation to the government, in consideration of the mail pay received, to keep at least five of them in repair, so that they could at any time be taken by the United States, and, with the least possible expense, be converted into war steamers of the first class. The mail contract, as entered into with the secretary of the navy, did not require the transportation of the mail direct from New Orleans to Aspinwall, though, by a subsequent arrangement, with the government, it was so transported, in substitution of the mail service between Havana and Aspinwall. This arrangement, however, terminated early in the summer of the year 1854, and the United States was employed between New Orleans.

and Aspinwall for two or three months after, at a great loss to the trust.

But it is not necessary to pursue the subject of the employment of the United States any further. Grant that the facts existed upon which the contract for the employment of the United States is attempted to be justified. It was a contract made by persons acting in a fiduciary capacity, with themselves and the other corporators of the United States Mail Steamship Company, in which they were personally interested, and from which they were to derive a pecuniary profit, to the prejudice of Sloo, one of the cestuis que trust, and made without his sanction, approval, or authority. Such a contract is always discountenanced by a court of equity. The temptation to fraud, and to the violation of trust duties, is too great, to permit such a contract to receive its sanction. In such a transaction, interest conflicts too much with duty.

Early in the year 1854, serious controversies having arisen between the Accessary Transit Company and Mr. Vanderbilt, the latter established a line of steamships communicating between New York and San Francisco, via the Isthmus of Panama, called the "Independent Line for California." As a part of that line, the steamship North Star plied between New York and Aspinwall. Competition ensued. To put an end to that competition, the United States Mail Steamship Company purchased the North Star from Mr. Vanderbilt, agreeing to pay for the same the sum of $400,000. Immediately after this purchase was made, Roberts, in behalf of himself and his co-trustee Van Nostrand, entered into an arrangement with the United States Mail Steamship Company, whereby the North Star took the place of one of the trust ships, between New York and Aspinwall, and carried the mail. She was taken into the line by Roberts as early as the 20th of September, 1854; for, on that day she made her first trip to Aspinwall in the trust line. She continued in the line, supplying the place of one of the trust ships, as late as the 8th of February, 1855. She was therefore employed by Roberts at a time during which the charter of the United States was in force; for the United States did not return to New York, and leave the business of the trust, until the 6th of October, 1854. The North Star was run on account of the United States Mail Steamship Company, and was to receive a portion of the mail pay. That was the arrangement entered into by Roberts. McIlvaine declined to enter into that arrangement, and he at all times declined to give his assent to the purchase of the North Star for the trust.

When the purchase of the North Star was made by the United States Mail Steamship Company, it was stipulated in the contract, that three-fifths of the gross receipts of her business should be applied, from time to time, in discharge of the $400,000 debt to Vanderbilt, and that the balance not paid in

that way should be paid within two years. Sloo never agreed to the arrangement which Roberts made in regard to the North Star. The arrangement in regard to her, as made by Roberts, is attempted to be justified on the same grounds urged for the employment of the United States, to wit, that there were not sufficient ships belonging to the trust in repair, to perform the service required by the mail contract, and that the arrangement was made to save the mail contract. For the reasons given when considering the case of the employment of the United States, the arrangement by Roberts, in opposition to the views of Sloo and McIlvaine, for permitting the North Star, navigated and employed for the benefit of the United States Mail Steamship Company, to take the place of one of the trust ships, cannot receive the sanction of a court of equity. It was a breach of trust—a violation of duty—on the part of Roberts, and of which Sloo has good cause to complain: and against the repetition of which he has a right to ask the interposition of the court. Such transactions, by any one acting in a fiduciary capacity, put in jeopardy the rights and interests of cestuis que trust, and stringent measures should be adopted to prevent a repetition of them, particularly as Roberts now insists that he has a right to do the same thing again, and has, since the bill was filed, employed another ship belonging to the United States Mail Steamship Company, the Grenada, in the same service.

The Grenada, belonging to the United States Mail Steamship Company, took the place of one of the trust ships on the 17th of April, 1855. When this motion for an injunction was made, in January, 1856, she was still in the line. She was run on account of the United States Mail Steamship Company, they taking the whole of her receipts. It will thus be seen that, during the whole time from the 27th of September, 1853, to the 28th of January, 1856, when this motion was made, with the exception of the period from the 8th of February, 1855, to the 17th of April, 1855, a ship of the United States Mail Steamship Company was employed, by either Law or Roberts, in the place of one of the trust ships, under the pretext that, for that period, there were not ships enough belonging to the trust in repair, to perform the service required by the mail contract. How much was received by the United States Mail Steamship Company under this arrangement, does not appear by the documents presented. They received for the charter of the United States $120,000. As the North Star and Grenada were run on account of the company, the amount which the company received for their employment cannot be ascertained from the documents presented, and it has not been stated in any of the affidavits. It must have been large; for, during their employment, the business appears to have been prosperous. Roberts says, that in the year 1854, when the

competition occasioned by the establishment of the Vanderbilt line existed, the prices of passage to California were comparatively low; and that, from about the month of March, 1854, to the month of September, of the same year, and until the North Star was purchased by the company, the price of a single steerage passage from New York to California was only thirty-five dollars. During this period of losing prices, the United States Mail Steamship Company were paid by Roberts a round sum for the charter of the United States. He says, that immediately after the purchase of the North Star, the price of a steerage passage from New York to San Francisco rose from thirty-five dollars to one hundred and twenty-five dollars. As soon as the period of high prices returned, one of the ships of the United States Mail Steamship Company (the North Star) was employed by him to take the place of one of the ships of the trust line, not upon a charter, as was the case with the United States during a period of low prices, but to run upon the account of the company, and the North Star was succeeded by the Grenada, which was run in the same way.

There are many other charges set forth in the bill and affidavits, upon which the plaintiffs rely to have an injunction issue against Roberts. After the view taken of the transactions in relation to the United States and the North Star, it is unnecessary to consider them, in disposing of this motion. They will all be proper subjects of investigation on the final hearing. By the exhibits produced, the balance of the construction account for the building of the ships, as kept and made out by the trustees, was, on the 1st of July, 1853, exclusive of the steamship George Law, the sum of $1,093,747.21. The construction account at a later date has not been presented. The plaintiffs insist that this is a false account; that there are charges in it, to a large amount, which have been inserted by the fraudulent procurement of certain parties; and that now the whole amount advanced for the building of the ships has been paid. It is not necessary, in disposing of this motion, to determine that question. The proper time to determine it will be upon the final hearing. The motion now made is for an injunction to prevent future abuses in the future management of the business of the trust, and not to settle rights which are dependent upon the correct adjustment of past charges on the books of the trustees.

Under the views above expressed, an order must pass to restrain the employment of any of the ships belonging to the United States Mail Steamship Company, or to any stockholder in that company, or to any or either of the trustees, or in which they or either of them have an interest (excepting the ships of the trust), in the business entrusted to the management of the trustees, without the concurrence or assent of the three trustees. The facts in the case, on this part of it, will not warrant an injunction to a greater extent.

Sloo does not ask, that for the employment of such ships his assent should be obtained.

By the indenture of the 21st of January, 1851, it was agreed that Howland & Aspinwall should sell, under the control and instructions of the United States Mail Steamship Company, all through passage tickets issued by that company; that they should receive all passage money for through passages, and all freight money for through freight of every description, upon all voyages made by steamships belonging to the trustees, from New York to any port on the Isthmus of Panama, from New Orleans to any port on said isthmus, and from any port on said isthmus to New York or to New Orleans; and that they should, without delay, deposit all monies received, to the credit of the trustees, in such bank as the trustees should designate, reserving out of such receipts a commission of two and one-half per cent. upon the gross amount so received. It appears that a portion of the money so received by Howland & Aspinwall has been, from time to time, paid by them to the Nicaragua Company, in pursuance of an agreement made between that company, and the Pacific Mail Steamship Company, and the United States Mail Steamship Company. There is no good reason to doubt that such payments were made by Howland & Aspinwall honestly. But Sloo has a right to demand that the contract of the 21st of January, 1851, by which they were authorized to receive the money, shall be kept and performed. An order must, therefore, be passed, requiring Howland & Aspinwall to deposit the money which they may receive under and by virtue of the contract of the 21st of January, 1851, deducting two and a half per cent., to the credit of the trustees, in such bank as the trustees may designate.

After the plaintiff Fisher was appointed a trustee in the place of McIlvaine, he went to the office of the trustees and agents, to examine their books. The books were exhibited to him by Croswell, one of the agents, for examination. While he was examining the same, and while they were being explained by Croswell, Roberts entered the office and closed the books, refusing to permit them to be examined by Fisher. One pretext for such refusal was, that they belonged to the United States Mail Steamship Company, of which Roberts was president. Fisher had a right to examine the books, and the refusal by Roberts to permit him so to do was a wrong. In this transaction, nothing exceptionable is found in the conduct of Croswell, and no order should be passed against him in regard thereto. But an order should pass enjoining Roberts and the United States Mail Steamship Company from withholding the books and papers of the trustees from the inspection and examination of Fisher, or of any trustee, at any reasonable time during the hours of business.

No further order is deemed necessary on this motion.